United States District Court
District of Massachusetts

———————————————————————————
                                    )
MARGARET HOWE, A.H., D.H. and       )
R.H.,                               )
            Plaintiffs,             )
                                    )    Civil Action No.
            v.                      )    10-10116-NMG
                                    )
THE TOWN OF NORTH ANDOVER,          )
EDWARD DOWNER, DEBRA SIMON,         )
MICHAEL CURRIER, SCOTT              )
MACKENZIE, BRYAN ERICKSON, SEAN     )
MCGARRY, JODI GERARDI, DAN          )
CIARDIELLO, MICHAEL MISKELL,        )
RICHARD STANLEY, JOHN CARNEY,       )
CHARLES GRAY, ROBERT BARTER, JAY    )
STAUDE, ROBERT HILLNER, RICHARD     )
DESFORGE and BRET GRAHAM,           )
            Defendants.             )
———————————————————————————         )

**MEMORANDUM & ORDER**

GORTON, J.

Margaret Howe ("Mrs. Howe") brings this wrongful death suit in connection with the death of her husband Kenneth Howe ("Mr. Howe") as administratrix of his estate and on behalf of herself and her three children (collectively, "the plaintiffs") against 17 individual defendants, including members of the Massachusetts State Police ("MSP"), the North Andover Police Department ("NAPD") and the Essex County Sheriff's Department ("ECSD"), and the Town of North Andover (collectively, "the defendants").

I.  **Facts**

     On the evening of November 25, 2009, a sobriety checkpoint

was set up on Route 114 in North Andover, Massachusetts and staffed by 33 officers of the MSP, the NAPD and the ECSD. The checkpoint consisted of an initial screening area and a "pit" area in which more detailed sobriety tests could be conducted. Among others, Sergeant Charles Gray and Troopers Jodi Gerardi and Daniel Ciardiello served as initial screeners.

That evening, Mr. Howe was heading West on Route 114 towards North Andover in a pick-up truck with friends Michael Garbauskas and Michael Barbour and his pit bull, Ruckus. Mr. Garbauskas was driving, Mr. Howe was sitting in the front seat and Mr. Barbour was in the back seat with Ruckus. Shortly before they arrived at the checkpoint, Mr. Howe and Mr. Barbour began to smoke a marijuana blunt. When they noticed the checkpoint, Mr. Garbauskas opened the windows to allow the marijuana smoke to dissipate and Mr. Howe attempted to extinguish the blunt quickly and put on his seatbelt.

As the truck entered the initial screening area, Trooper Gerardi noticed Howe making what she described as "furtive movements." She approached the passenger side of the vehicle to investigate. After detecting the odor of marijuana, she ordered Mr. Howe out of the truck. Details of the initial interaction between Mr. Howe and Trooper Gerardi are disputed, though not

crucial to deciding the pending motions.[1]  In some fashion, Mr.
Howe got out of the truck and became engaged in a brief physical
struggle with Trooper Gerardi, after which Mr. Howe attempted to
flee. When Trooper Gerardi called out for help, a number of
officers responded.

As co-screeners, Sergeant Gray and Trooper Ciardiello were
the first to respond.  Mr. Howe thwarted their initial attempts
to apprehend him and ran toward the adjoining lawn of the
Lawrence Eagle-Tribune, where he found himself corralled by
officers.  Detective Barter joined with Sergeant Gray and Trooper
Ciardiello to take him to the ground.  After Howe was on the
ground, more officers joined in.  Officer Mackenzie handcuffed
Mr. Howe, first with his arms in front of his torso and later
with his arms behind his back.  Troopers Erickson, Miskell and
McGarry held Mr. Howe down while Officer Graham affixed leg
shackles on him.  Trooper Currier joined the fray and helped pin
Mr. Howe to the ground.  According to some witnesses, Trooper
McGarry struck Mr. Howe a number of times with his hands and
baton and Officer Desforge put Mr. Howe in a choke hold for an
extended period of time.  All in all, between 10 and 15 officers
combined forces to subdue Mr. Howe.

---

[1] Witnesses dispute whether Mr. Howe struck Trooper Gerardi,
or vice versa, before leaving the vehicle and how Mr. Howe got
out of the vehicle, i.e., whether he was pulled out through the
window or voluntarily got out through the passenger door.

Approximately eleven minutes after Howe was forced to the ground, between two and four officers picked him up and moved him to a police cruiser.[2] Mr. Howe's physical condition at that time is a disputed issue of fact. Some witnesses report that Mr. Howe did not appear to be conscious and was dragged to the cruiser, while others attest that he walked to the cruiser under his own power. Once in the cruiser, Mr. Howe was transported by Trooper Mackenzie, pursuant to orders from Lieutenant Downer, to the Massachusetts State Police barracks in Andover, Massachusetts ("MSP Barracks").

When they arrived at the MSP Barracks, Mr. Howe was unconscious and Trooper Mackenzie could not revive him. Another trooper called an ambulance and attempted cardiopulmonary resuscitation. When emergency medical technicians arrived at 12:05 a.m., Mr. Howe had no pulse. They transported him to Lawrence General Hospital, where further attempts to revive him failed. He was pronounced dead at 12:17 a.m. An autopsy performed by Kimberly Springer of the Office of the Chief Medical Examiner ruled the cause of death as "blunt impact of head and torso with compression of chest" and the manner of death as "homicide."

---

[2] The duration of the restraint can be determined with some precision by virtue of the 43 time-stamped photographs taken by Carl Russo, a photographer for the Lawrence Eagle-Tribune, who happened upon the scene and chronicled the events as they unfolded.

## II.  **Procedural History**

On January 26, 2010, Mrs. Howe filed a Complaint as
administratrix of the estate of Mr. Howe and on behalf of herself
and her three children, referred to in the Complaint as A.H.,
D.H. and R.H., against the Town of North Andover ("the Town") and
34 police officers.  Mrs. Howe voluntarily dismissed without
prejudice claims against 16 of the officers whom she determined
after discovery did not participate in the incident.  In
addition, the Court has since allowed the motion to dismiss of
Colonel Mark Delaney.  The 17 officers remaining in the suit
("the Officers") are Troopers Daniel Ciardiello, Michael Currier,
Bryan Erickson, Jodi Gerardi, Scott Mackenzie, Sean McGarry and
Michael Miskell and Lieutenants Debra Simon and Edward Downer of
the MSP; Chief Richard Stanley, Lieutenant John Carney, Sergeant
Charles Gray and Officers Robert Barter, Jay Staude and Robert
Hillner of the NAPD; and Officers Richard Desforge and Bret
Graham of the ECSD.

The Complaint asserts federal claims against the defendants
pursuant to 42 U.S.C. § 1983.  Count I alleges that the Officers
used excessive force, failed to intervene and failed to provide
timely medical services, in violation of the Fourth, Eighth and
Fourteenth Amendments to the United States Constitution,
respectively.  Count II alleges that Chief Stanley, Lieutenants
Downer, Simon and Carney and Sergeant Gray were deliberately

-5-

indifferent to the conduct of their subordinate officers and are therefore liable for the constitutional violations alleged in Count I. Count III alleges that the Town had a custom, policy or practice of failing to investigate, discipline, supervise or train its officers, which demonstrated a deliberate indifference to the rights of Mr. Howe and directly caused the constitutional violations alleged in Count I. Count IV alleges that the defendants conspired to violate Mr. Howe's constitutional rights.

The Complaint also lodges state-law claims against the Officers for violation of the Massachusetts Civil Rights Act (Count V), assault (Count VI), battery (Count VII), intentional infliction of emotional distress (Count VIII) and loss of consortium (Counts IX-XII). The Complaint gives notice, pursuant to M.G.L. c. 258, § 4, that the plaintiffs may move to amend the Complaint to include claims for negligence (Counts XIII and XIV), wrongful death (Counts XV and XVI) and conscious pain and suffering (Counts XVII), when such claims ripen. As of the date of this memorandum, the plaintiffs have not moved to amend the Complaint.

On September 9, 2011, plaintiff filed a motion for partial summary judgment which defendants opposed. On that same date, defendants filed eleven separate motions for summary judgment and one consolidated motion joined by most of the movants, all of which plaintiff has opposed. Those motions are currently pending

before the Court.

III. **Summary Judgment Standard**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." <u>Mesnick</u> v. <u>Gen. Elec. Co.</u>, 950 F.2d 816, 822 (1st Cir. 1991). The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law." <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u>

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. <u>Celotex Corp.</u> v. <u>Catrett</u>, 477 U.S. 317, 324 (1986). The Court must view the entire record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. <u>O'Connor</u> v. <u>Steeves</u>, 994 F.2d 905, 907 (1st Cir. 1993). Summary judgment is appropriate if, after viewing the record in the

non-moving party's favor, the Court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.

**IV. § 1983 - Direct Liability (Count I)**

The Federal Civil Rights Act, codified at 42 U.S.C. § 1983 and hereafter referred to as "§ 1983," provides individuals with a cause of action against police officers who, while acting under color of law, deprive them of a right or privilege secured by the Constitution or laws of the United States. Cruz-Erazo v. Rivera-Montanez, 212 F.3d 617, 621 (1st Cir. 2000). The judicially engrafted doctrine of qualified immunity shields police officers from § 1983 liability if the constitutional right at issue was not "clearly established" at the time of the alleged violation. Thus, for § 1983 liability to attach, a plaintiff must establish both that 1) an officer acting under color of law violated his constitutional right and 2) the right was clearly established at the time of the violation.

Plaintiffs allege in Count I that the Officers are directly liable under 42 U.S.C. § 1983 for using excessive force, failing to intervene and failing to provide medical services, in violation of the Fourth, Eighth and Fourteenth Amendments, respectively.[3] As a point of clarification, excessive force,

_____

[3] Because plaintiffs' claim for deliberate indifference to serious medical needs is properly analyzed under the Fourteenth Amendment, not the Eighth Amendment, Brace v. Massachusetts, 673

-8-

failure to intervene and failure to render adequate medical assistance are not different counts but rather separate alleged constitutional violations that give rise to direct liability under § 1983.

Plaintiffs and defendants have filed cross-motions for summary judgment on Count I.

### A. Plaintiffs' Motion for Partial Summary Judgment

The plaintiffs seek partial summary judgment on Count I on the grounds that 1) Detective Barter, Officer Desforge and Troopers Mackenzie, McGarry and Miskell used excessive force as a matter of law and 2) Lieutenants Simon and Downer, Detective Barter, Officers Desforge and Graham, Sergeant Gray and Troopers McGarry, Erickson, Currier, Miskell and Mackenzie failed to intervene and evinced deliberate indifference to Mr. Howe's serious medical needs.

To obtain summary judgment on Count I, plaintiffs must demonstrate that 1) the undisputed facts, when viewed in the light most favorable to the defendants, establish that the above-listed defendants violated Mr. Howe's Fourth or Fourteenth Amendment rights as a matter of law and 2) those rights were clearly established at the time of the alleged violation.

F. Supp. 2d 36, 40 n.2 (D. Mass. 2009) (explaining that the Eighth Amendment governs such claims brought by convicted inmates, while the Fourteenth Amendment governs such claims brought by suspects and pretrial detainees), the Court makes no further reference to plaintiffs' Eighth Amendment claim.

### 1.   Excessive Force

Excessive force claims made in the context of a stop or arrest are analyzed under the Fourth Amendment's "reasonableness" standard. <u>Graham</u> v. <u>Connor</u>, 490 U.S. 386, 394-95 (1989).  In making a stop or arrest, a police officer has the right to employ "some degree of physical coercion or threat thereof to effect it." <u>Id.</u>  Whether an officer's use of force was reasonable "must be judged from the perspective of a reasonable officer on the scene." <u>Id.</u> at 396.  While the reasonableness standard "is not capable of precise definition or mechanical application," and its proper application requires careful attention to the unique facts and circumstances of each case, courts pay particular attention to the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others and whether he is actively resisting or attempting to evade arrest. <u>Id.</u> at 396.  Because officers are often forced to make split-second decisions about the amount of force needed to effect an arrest while operating under tense, dangerous and rapidly changing circumstances, "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" will give rise to a constitutional violation. <u>Id.</u>

The Fourth Amendment not only protects individuals from excessive force, it likewise imposes an affirmative duty on

police officers to intervene to prevent it. <u>See</u> <u>Gaudreault</u> v. <u>Municipality of Salem, Mass.</u>, 923 F.2d 203, 207 n.3 (1st Cir. 1990). An officer who is present at the scene of a stop or arrest and observes excessive force but fails to intervene violates of the Fourth Amendment if he had both the means and the opportunity to prevent or mitigate the harm to the victim. <u>Id.</u>

Plaintiffs submit that they are entitled to judgment as a matter of law on their claims that Detective Barter, Officer Desforge and Troopers Mackenzie, McGarry and Miskell used excessive force on Mr. Howe and that Lieutenants Simon and Downer, Detective Barter, Officers Desforge and Graham, Sergeant Gray and Troopers McGarry, Erickson, Currier, Miskell and Mackenzie failed to intervene to protect him. Plaintiffs acknowledge that if Mr. Howe acted as the defendants allege, some force may have been necessary initially to prevent him from fleeing the scene. They nonetheless contend that once Mr. Howe was handcuffed, shackled and pinned on the ground by multiple officers, he was incapable of evading arrest and posed no further threat to anyone. According to the plaintiffs, the continued use of force by the above-listed officers in pinning Mr. Howe to the ground in the prone position for an unreasonable length of time constitutes excessive force as a matter of law.

Plaintiffs suggest that this was more than a "pig pile" gone wrong. Melvin Tucker, plaintiffs' use-of-force expert, explains

that the circumstances are consistent with "positional asphyxia,"
a disruption of blood flow to the brain caused by the compression
of the chest and/or neck known to occur when force is used to
restrain a person in a prone position.  A United States
Department of Justice report titled "Positional Asphyxia - Sudden
Death" describes the vicious cycle of suspect resistance and
officer restraint that can lead to positional asphyxia:

   1)  as the suspect is restrained in a face-down position,
       the suspect's breathing becomes labored and the suspect
       struggles to get air;

   2)  in response to the suspect's struggle, officers apply
       weight to the suspect's back;

   3)  the more weight that is applied, the more severe the
       degree of compression becomes;

   4)  the greater the degree of compression, the more
       difficult it becomes for the suspect to breathe;

   5)  reacting naturally to oxygen deprivation, the suspect
       struggles more violently; and

   6)  in response to the increasingly violent struggle, the
       officers apply more force to subdue the suspect.

   Plaintiffs are correct that such conduct, if proved, could
give rise to § 1983 liability under an excessive force theory.
Champion v. Outlook Nashville, Inc., 380 F.3d 893, 903 (6th Cir.
2004) ("[P]utting exceptional pressure on a suspect's back while
that suspect is in a face down prone position after being subdued
and/or incapacitated, constitutes excessive force."); Weigel v.
Broad, 544 F.3d 1143 (10th Cir. 2008) ("[A]pplying pressure to [a
suspect's] upper back, once he [is] handcuffed and his legs

-12-

restrained, [is] constitutionally unreasonable due to the significant risk of positional asphyxiation associated with such actions.").

Nevertheless, summary judgment in favor of the plaintiffs on the excessive force claims is unwarranted because genuine issues of material fact remain as to the extent of the force used and whether it was reasonable under the circumstances. The above-named officers acknowledge some physical involvement in the altercation but dispute the nature of that involvement. Trooper McGarry denies striking Mr. Howe in the side. Officer Desforge claims that he merely held Mr. Howe by the shoulders and denies putting him in a choke hold. Detective Barter and Troopers Miskell and Mackenzie each admit to holding down Mr. Howe but deny putting substantial pressure on him.

Even if a consensus were reached as to the extent of force used, however, summary judgment would be improper because a reasonable jury could find that such conduct was not only reasonable but necessary to restrain Mr. Howe and prevent him from injuring the officers. While plaintiffs depict Mr. Howe as a motionless body crushed under the collective force of the arresting officers, the defendants paint a much different picture. Many officers testified that Mr. Howe thrashed around the entire time he was on the ground and clenched his fists in an apparent effort to conceal pills he was holding in his hands. If

a jury were to credit their account, it would be entitled to find in their favor.

Just as genuine issues of material fact defeat summary judgment with respect to the excessive force claim, they also defeat summary judgment with respect to the failure to intervene claim. Because plaintiffs cannot prove the existence of excessive force as a matter of law, they cannot, a fortiorari, prove as a matter of law that defendants failed to intervene to prevent that force.

### 2. Deliberate Indifference to Serious Medical Needs

A police officer who fails to provide adequate medical treatment to an individual injured during apprehension violates the Fourteenth Amendment if such inattention constitutes deliberate indifference to serious medical needs. Brace, 673 F. Supp. 2d at 40. A medical need is "serious" if so diagnosed by a physician or if a lay person would easily recognize the need for urgent medical attention. Id. at 40-41. A showing of deliberate indifference, in this context, requires more than mere inadvertence or negligence. Rather, a plaintiff must establish that the officer was aware of a substantial risk of serious harm which he intentionally disregarded. Id. at 41.

Plaintiffs submit that the undisputed facts establish as a matter of law that Lieutenants Simon and Downer, Detective Barter, Officers Desforge and Graham, Sergeant Gray and Troopers

-14-

McGarry, Erickson, Currier, Miskell and Mackenzie failed to provide Mr. Howe with adequate medical care once it became apparent that he was in serious medical trouble.

Plaintiffs emphasize that it should have been evident from the sheer amount of force used that Mr. Howe would be in need of urgent medical care. Among other evidence, they point to the impression of one disinterested witness, who was incredulous that Mr. Howe was not transported to the hospital after the incident:

> I remember being definitely surprised that when we did read an article that the man was brought to the police barracks. That was absolutely disturbing and shocking, because . . . it just didn't seem like anyone could withstand the thuds that we could hear from where we were and not have suffered some sort of damage.

At the very least, plaintiffs assert, the above-listed officers should have ascertained the need for immediate medical care as soon as Mr. Howe was dragged, unconscious, to the police cruiser.

While the evidence adduced, if proved, is enough to support a jury finding that certain of the Officers evinced deliberate indifference to Mr. Howe's serious medical needs, summary judgment is unwarranted because genuine issues of material fact remain as to whether 1) a substantial risk of harm existed, 2) the Officers were subjectively aware of that risk and 3) they intentionally disregarded it. A number of witnesses have stated that Mr. Howe did not appear to be in medical distress during or immediately after the incident, noting that he thrashed around while on the ground, eventually walked to the police cruiser

-15-

under his own power and, while appearing winded, was conscious
and breathing when he left the scene.  If a jury were to credit
their version of events, it could reasonably conclude that the
conduct of the Officers was suitable and did not violate the
Constitution.

### 4.   Conclusion

In light of the foregoing, plaintiffs' motion for partial
summary judgment on Count I will be denied.  Because genuine
issues of material fact prevent the plaintiffs from establishing
a constitutional violation as a matter of law, the Court reserves
the question of whether the constitutional rights at issue were
clearly established at the time of the alleged violation.

### B.   Defendants' Motions for Summary Judgment

In addition to opposing plaintiffs' motion for summary
judgment on Count I, the Officers assert that they are entitled
to summary judgment themselves.  To determine whether that is so,
this Court must decide, with respect to each Officer, 1) whether
the factual record, when viewed in the light most favorable to
the plaintiffs, could support a jury finding that the Officer
violated Mr. Howe's Fourth Amendment or Fourteenth Amendment
rights and 2) if so, whether the right at issue was "clearly
established" when the incident took place, such that a reasonable
police officer in the Officer's position would have understood
that his actions infringed that right. <u>Morelli</u> v. <u>Webster</u>, 552

-16-

F.3d 12, 22-23 (1st Cir. 2009).

### 1.  Constitutional violation

Viewing the extensive summary judgment record in the light most favorable to the plaintiffs, a reasonable jury could conclude that Detective Barter, Officers Graham and Desforge and Troopers Currier, Erickson, Miskell, Mackenzie and McGarry ("Restraining Officers") used excessive force by 1) striking Mr. Howe after he was handcuffed and shackled (Trooper McGarry), 2) placing him in a choke hold for an unreasonable length of time (Officer Desforge) and 3) exerting substantial pressure on his torso while he was in a face-down prone position after danger had subsided (Detective Barter, Officers Graham and Desforge and Troopers Currier, Erickson, Miskell, Mackenzie and McGarry). Because plaintiffs appear to concede that the force used at the outset to apprehend Mr. Howe was reasonable to prevent him from escaping or harming the other officers, the excessive force claims against Sergeant Gray and Troopers Gerardi and Ciardiello will not survive summary judgment.  Excessive force claims against the remaining Officers, none of whom is alleged to have touched Mr. Howe, will likewise be dismissed.

If a jury were to find that one or more of the Restraining Officers used excessive force, it could also reasonably conclude that Lieutenants Simon and Downer, Sergeant Gray, Troopers Gerardi and Ciardiello and Officers Hillner and Staude ("Witnessing

Officers"), by virtue of their presence in the immediate vicinity and status as police officers, had the means and the opportunity to prevent or mitigate the harm to Mr. Howe.[4]  Whether they had enough time to intercede or were capable of preventing or mitigating the harm is an issue of fact for the jury. <u>Vondrak</u> v. <u>City of Las Cruces</u>, 535 F.3d 1198, 1210 (10th Cir. 2008).

Finally, a reasonable jury could conclude from the record that the Witnessing Officers disregarded their constitutional duty to provide medical treatment to Mr. Howe.  If a jury were to credit the account of witnesses who insist that Mr. Howe was dragged, unconscious, to the police cruiser after being pinned to the ground under the weight of approximately eight officers for eleven minutes, it could certainly find that the inaction of the Witnessing Officers constituted deliberate indifference to his serious medical needs.

### 2.    Qualified immunity

Having concluded that a reasonable jury could find that some of the Officers violated the Fourth and Fourteenth Amendment rights of Mr. Howe, the Court turns its attention to whether the rights at issue were "clearly established" when the incident took

---

[4] By affixing the label "Witnessing Officers," the Court does not take the position that those Officers actually witnessed the restraint or had the means and opportunity to intervene.  It concludes only that the plaintiffs have adduced enough evidence on those points to create genuine issues of material fact properly reserved for a jury.

place.  To determine whether a right is clearly established,
courts first inquire whether the right, defined generally, has
constitutional moorings, e.g., "*Does the First Amendment
guarantee freedom of speech?*", before surveying the caselaw to
ascertain whether courts have concluded that materially similar
conduct by other police officers violates that right, e.g., "*Has
an officer's arrest of a non-violent protestor for carrying a
sign with an explicit photograph in a public park been recognized
as an actionable First Amendment violation?*".  If the case is one
of first impression, courts instead ask whether "a reasonable
officer would not have required prior caselaw on point to be on
notice that his conduct was unlawful." <u>Jennings</u> v. <u>Jones</u>, 499
F.3d 2, 16-17 (1st Cir. 2007).

There is little doubt that the rights asserted here were
clearly established.  It goes without saying that the Fourth
Amendment guarantees the right to be free from excessive force.
Police officers need not be reminded that the Fourth Amendment
prohibits them from beating a handcuffed and shackled suspect,
<u>Ruble</u> v. <u>King</u>, 911 F. Supp. 1544, 1557 (N.D. Ga. 1995) ("[T]he law
is clearly established that an officer may not beat [a suspect]
who is handcuffed and shackled and poses no danger to the
officer."), or pinning a suspect to the ground in the prone
position long after the need to restrain that suspect has
subsided, <u>Champion</u>, 380 F.3d at 903 ("[I]t is clearly established

-19-

that putting exceptional pressure on a suspect's back while that suspect is in a face down prone position after being subdued and/or incapacitated, constitutes excessive force."). Police officers are likewise on notice that they have an affirmative duty to intervene to prevent excessive force when they have the means and opportunity to do so, Gaudreault, 923 F.2d 207 n.3, and must not ignore the serious medical needs of individuals injured during the course of an arrest, Brace, 673 F. Supp. 2d at 40.

Because the rights at issue in this case have clear constitutional pedigrees, the qualified immunity inquiry boils down to whether the conduct of each Officer, if wrongful, was the "kind of erroneous judgment that a reasonable police officer under the same or similar circumstances would have made." Morelli, 552 F.3d at 24. Stated differently, the question at this juncture is whether the plaintiffs' version of the relevant facts places the conduct of the Officers "outside the universe of protected mistakes." Id.

Viewing the facts from the plaintiffs' perspective, a reasonable jury could find that the actions of the Restraining Officers and the Witnessing Officers were so objectively unreasonable and plainly misguided that qualified immunity should not be interposed to shield them from liability. Mr. Howe, who stood five-feet eight-inches tall and weighed approximately 165 pounds, was forcibly restrained in the prone position by

approximately eight larger officers for more than ten minutes. They allegedly continued to pile on him after he complained that he could not breathe. Under the plaintiffs' version of the facts, the Restraining Officers, who were purportedly trained that such a scenario carries with it a high risk of positional asphyxia, disregarded that risk even though, at the time, Mr. Howe posed little threat to injure them or escape. The Witnessing Officers, standing close by, purportedly did nothing. Defendants may be correct that this was precisely the kind of dangerous and rapidly evolving situation which qualified immunity was designed to cover but, in light of the many unsettled issues of material fact, that decision is properly reserved for the jury.

The Court reaches the opposite conclusion with respect to Chief Stanley and Lieutenant Carney, who noticed the commotion from afar but were not close enough to discern exactly what was happening and reasonably concluded that it did not call for their intervention. In the unlikely event that a constitutional violation could be proved against either of them, qualified immunity would shield them from liability.

In light of the foregoing, summary judgment on Count I will be entered in favor of Chief Stanley and Lieutenant Carney but will be denied with respect to Lieutenants Simon and Downer, Sergeant Gray, Detective Barter, Officers Desforge, Graham,

Staude and Hillner and Troopers Ciardiello, Currier, Erickson, Mackenzie, McGarry, Miskell and Gerardi.

## V.    § 1983 - Supervisory Liability (Count II)

Plaintiffs allege in Count II that Chief Stanley, Sergeant Gray and Lieutenants Downer, Simon and Carney ("Supervising Officers") were deliberately indifferent to the conduct of their subordinate officers and are thus liable for the constitutional violations alleged in Count I.[5]  The Supervising Officers assert that they are entitled to summary judgment with respect to Count II because 1) their conduct did not amount to deliberate indifference and 2) qualified immunity shields them from liability.

A supervising police officer is not vicariously liable for the conduct of his subordinate officers.  For supervisory liability to attach under § 1983, in addition to establishing a constitutional deprivation, the plaintiff must show an affirmative link between the conduct of the supervisor and the constitutional violation, such as "supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference." Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008).

Chief Stanley and Lieutenant Carney are entitled to summary judgment with respect to Count II because plaintiffs have adduced

---

[5] Again, the label "Supervising Officers" is adopted for clarification purposes only and does not reflect any judgment by the Court that the referenced officers supervised the restraint.

no evidence of any action taken by them which could be reasonably interpreted as forming an affirmative link to the alleged constitutional violations. Chief Stanley was not present at the sobriety checkpoint at the outset. He proceeded to the scene only after he heard a radio transmission requesting backup. When he arrived, he witnessed from a distance officers removing Mr. Howe to the police cruiser. A few minutes later, he left the scene. Lieutenant Carney, while a supervisor in title, was not supervising the screening area during the altercation. Rather, he was in the pit area conversing with reserve officers. When he noticed some commotion at the periphery, he walked over to the street to redirect traffic. He did not venture farther because a large number of officers had already responded and, in his opinion, the situation appeared to be under control. The mere presence of Chief Stanley and Lieutenant Carney in the checkpoint area along with their status as supervising officers, without more, is too tenuous a connection to give rise to supervisory liability.

Lieutenant Simon, the officer in charge of the pit area, was far more involved. When she heard Trooper Gerardi yell for help, she immediately ran from the pit area to the scene of the commotion. When she arrived, officers were in the process of tackling Mr. Howe and pinning him to the ground. While standing close by, she heard Mr. Howe exclaim, "I can't breathe," and "Get

off me," but she admits that she was not concerned for his safety. She has also testified that she made the determination that Mr. Howe did not need medical attention "from the moment they stood him up." When Sergeant Gray asked her if she wanted an ambulance, she responded, "Let's get him back to the barracks."

Lieutenant Downer, the officer in charge of the entire sobriety checkpoint, was likewise in the immediate vicinity and supervised the restraint of Mr. Howe. Similar to Lieutenant Simon, Lieutenant Downer arrived on the scene just as officers had begun to pin Mr. Howe to the ground. According to his testimony, he witnessed the entire incident and, after it was over, ordered Trooper Mackenzie to transport Mr. Howe to the MSP Barracks.

Viewing the facts in a light most favorable to the plaintiffs, a reasonable jury could find that Lieutenants Simon and Downer supervised the restraint and condoned, if not encouraged, the actions of the Restraining Officers. A reasonable jury could likewise determine that no sensible supervisor in their situation would have allowed their subordinate officers 1) to continue to exert substantial force against after Mr. Howe long after he had been subdued or 2) to remove an unconscious Mr. Howe to a police cruiser and transport him to a barracks instead of a hospital. They gave the orders and, if a jury credits plaintiffs' account, they may be found

-24-

responsible.

Sergeant Gray's involvement falls somewhere in the middle between mere presence at the scene (Chief Stanley and Lieutenant Carney) and active supervision (Lieutenants Simon and Downer). By virtue of his inexperience with sobriety checkpoints, Sergeant Gray worked as a screener. As such, he was present at the outset of the altercation between Mr. Howe and Trooper Gerardi and was one of the first officers to respond. Along with Detective Barter and Trooper Ciardiello, he was able to apprehend Mr. Howe and bring him to the ground. Soon thereafter, Sergeant Gray extracted himself from the scuffle to control Ruckus, the decedent's pit bull, when it entered the fray. When he turned his attention back to Mr. Howe, he perceived the situation to be well in hand and did not become physically involved. At some point, he asked Lieutenant Simon, whom he apparently deduced was the officer in charge, whether he should call an ambulance.

The actions of Sergeant Gray are not subject to a finding of supervisory liability. While Sergeant Gray may have technically outranked some of the other officers, he did not supervise any aspect of the checkpoint nor was he recognized by others as a supervising officer. He gave no orders and his actions indicate that he deferred to Lieutenants Simon and Downer. By asking Lieutenant Simon whether he should call an ambulance, Sergeant Gray demonstrated that he was not indifferent to the rights or

well-being of Mr. Howe.

In light of the foregoing, summary judgment on Count II will be allowed with respect to Chief Stanley, Lieutenant Carney and Sergeant Gray but will be denied with respect to Lieutenants Simon and Downer.

## VI.   § 1983 – Municipal Liability (Count III)

Plaintiffs allege in Count III that the Town is liable for the constitutional violations alleged in Count I.

Just as supervising officers are not vicariously liable for the conduct of their subordinate officers, neither are municipalities vicariously liable for the conduct of their police officers. See Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658 (1978).  For municipal liability to attach under § 1983, in addition to establishing a constitutional deprivation, the plaintiff must show that: 1) the municipality had a custom, policy or practice of failing to investigate, discipline, supervise or train its officers, which 2) demonstrated "deliberate indifference" to the rights of those citizens with whom its officers came into contact and 3) directly caused the alleged constitutional violation. Estate of Bennett v. Wainwright, 548 F.3d 155, 177 (1st Cir. 2008).

Plaintiffs plead the foregoing elements but fail to support them with any evidence.  They point to no specific offending North Andover custom or policy much less explain how such a

custom or policy was the underlying cause of the excessive force alleged in this case. Instead, they allege vaguely that the untimely death of Mr. Howe was brought about by negligent training and supervision and deliberate failure to discipline prior violations.

Plaintiffs' theory seems to be that the Town's wrongdoing is somehow self-evident:

> The occurrence of the constitutional violations as mentioned above in this Complaint within the presence of such a large number of police officers illustrates an inadequately trained and/or supervised police force on the policies, protocols, and customs of the use of reasonable force to apprehend unarmed suspects, the intervention of officers when such excessive force is used, and the provision of adequate and timely medical services.

Res ipsa loquitur is no basis for municipal liability. The undisputed facts establish that the MSP, NAPD and ECSD had accredited policies and procedures in place regarding the lawful use of force and the dangers of positional asphyxia. The record indicates that the Officers underwent training on those policies and were versed in their application. Plaintiffs have proffered no evidence to challenge those facts. Indeed, plaintiffs referenced those very policies and procedures as evidence that the Officers were on notice that their conduct might have led to positional asphyxia. Under these circumstances, summary judgment will be entered in favor of the municipal defendant. Whitfield v. Meléndez-Rivera, 431 F.3d 1, 9-14 (1st Cir. 2005).

**VI.** **§ 1983 - Conspiracy Liability** (Count IV)

Plaintiffs allege in Count IV that the defendants conspired to deprive Mr. Howe of the equal protection of the law, in violation of 42 U.S.C. § 1983. Defendants maintain that they are entitled to summary judgment because plaintiffs have not produced any evidence of a conspiracy.

While a conspiracy may be established by implication through circumstantial evidence, summary judgment is warranted where the non-moving party relies solely on conclusory allegations and presents

> no evidence, either direct or circumstantial of an agreement among defendants from which a reasonable jury could [infer the existence of] a conspiracy among them.

Estate of Bennett, 548 F.3d at 178. Here, plaintiffs have neither stated with specificity allegations advancing their conspiracy theory nor supported their allegations with direct or even circumstantial evidence of a conspiracy. Accordingly, their conspiracy claim fails as a matter of law. Id.

**VIII.** **Massachusetts Civil Rights Act** (Count V)

Plaintiffs allege in Count V that the Officers violated Mr. Howe's rights under the Massachusetts Civil Rights Act, M.G.L. ch. 12, § 11I ("MCRA").

By itself, an officer's direct violation of an individual's constitutional right does not give rise to a MCRA violation because "it is not an attempt to force someone to do something

-28-

the person is not lawfully required to do." Columbus v. Biggio,
76 F. Supp. 2d 43, 54 (D. Mass. 1999) (quoting Swanset Dev. Corp.
v. City of Taunton, 668 N.E.2d 333, 338 (Mass. 1996)); see also
Gallagher v. Commonwealth, No. 00-11859-RWZ, 2002 WL 924243, at
*3 (D. Mass. Mar. 11, 2002) ("The use of force is not, in itself,
coercive within the meaning of the act unless such force is
inflicted in order to achieve some further purpose."); Goddard v.
Kelley, 629 F. Supp. 2d 115, 129 (D. Mass. 2009) (explaining that
a contrary reading would "torture the [MCRA] well beyond its
plain meaning").

Accordingly, to survive summary judgment with respect to
their MCRA claim, plaintiffs must offer enough evidence from
which a reasonable jury could conclude that the Officers
threatened, intimidated or coerced Mr. Howe with the specific
intent to prevent him from exercising a constitutional right.
Spencer v. Roche, 755 F. Supp. 2d 250, 267 (D. Mass. 2010).
Finding none, the Court concludes that the Officers are entitled
to summary judgment with respect to Count V.

**IX.  Assault and Battery (Counts VI and VII)**

Plaintiffs allege in Counts VI and VII that the Officers
committed assault and battery against Mr. Howe.  Under
Massachusetts law, a police officer who intentionally causes
harmful or offensive contact or attempts to do so during the
course of an arrest is liable for the common law torts of assault

-29-

and battery, respectively, if he uses excessive force in effecting that arrest. <u>Raiche</u> v. <u>Pietroski</u>, 623 F.3d 30, 40 (1st Cir. 2010). Where, as here, a plaintiff brings both a § 1983 excessive force claim and state law claims for assault and battery, the Court's determination of the reasonableness of the force used with respect to the § 1983 claim controls its assault and battery analysis. <u>Id.</u>

Because genuine issues of material fact remain with respect to the reasonableness of the force used, defendants' motions for summary judgment on Counts VI and VII will be denied with respect to Detective Barter, Officers Graham and Desforge and Troopers Currier, Erickson, Miskell, Mackenzie and McGarry. Summary judgment will, however, be entered in favor of the remaining Officers who either did not touch Mr. Howe or whose contact with him at the outset was reasonable.

## X. <u>Intentional Infliction of Emotional Distress</u> (Count VIII)

Plaintiffs allege in Count VIII that the Officers intentionally inflicted emotional distress upon Mr. Howe. According to the Officers, they are entitled to summary judgment on Count VIII because their conduct was not extreme and outrageous as a matter of law.

To maintain a cause of action for intentional infliction of emotional distress ("IIED") under Massachusetts law, a plaintiff must establish that 1) the defendants intended to inflict

-30-

emotional distress or that they knew or should have known that emotional distress was the likely result of their conduct, 2) defendants' conduct was extreme and outrageous beyond all bounds of decency, 3) defendants' actions were the cause of the plaintiff's distress and 4) the distress was so severe that no reasonable person could be expected to endure it. <u>Agis</u> v. <u>Howard Johnson Co.</u>, 355 N.E.2d 315, 318-19 (Mass. 1976).

Plaintiffs do not appear to dispute that Mr. Howe initiated the altercation with the police and that some quantum of force was justified to subdue him. Rather, they take issue with the duration and kind of force used once Mr. Howe was substantially restrained. Assuming their allegations of excessive force are found to be true, the plaintiffs have not alleged with specificity, nor is there evidence to demonstrate, that the Officers intended to cause Mr. Howe severe emotional distress. Nor can plaintiffs point to any facts which, if proven, would establish that the conduct of the Officers was "extreme and outrageous" or "beyond all possible bounds of decency" or "utterly intolerable in a civilized community." <u>Id.</u> at 319. Accordingly, defendants' motions for summary judgment will be allowed with respect to Count VIII.

## XI.  **Loss of Consortium (Counts IX, X, XI and XII)**

The Complaint includes claims for loss of consortium brought separately by Mrs. Howe and her three minor children (Counts IX-

XII).  Under Massachusetts law, the spouse and children of a decedent may assert a claim for loss of consortium against a tortfeasor to compensate them for the deprivation of the benefits of their relationship with the decedent.  See Sena v. Commonwealth, 629 N.E.2d 986, 994 (Mass. 1994).  Because state-law assault and battery claims against Detective Barter, Officers Graham and Desforge and Troopers Currier, Erickson, Miskell, Mackenzie and McGarry survived summary judgment, plaintiffs' loss of consortium claims likewise are viable.

## XII. Pending Claims (Counts XIII-XVII)

The Complaint avers:

> Upon such time as their claims ripen, Plaintiffs will move pursuant to Mass. R. Civ. P. 15 to amend this Complaint to allege the following Counts XIII, XIV, XV, XVI, and XVII.

Those Counts are later described as claims for negligence against the Officers (Count XIII), negligence against the Town, MSP and ECSD (Count XIV), wrongful death against the Officers (Count XV), wrongful death against the Town, MSP and ECSD (Count XVI) and conscious pain and suffering against the Officers (Count XVII). Because the plaintiffs have not yet moved to amend the Complaint to add those claims, it is premature for the Court to rule on them.

**ORDER**

In accordance with the foregoing,

1)     Plaintiffs' motion for partial summary judgment (Docket No. 240) is **DENIED**;

2)    motion for summary judgment filed jointly by defendants
      Robert Barter, John Carney, Charles Gray, Robert
      Hillner, Richard Stanley, Jay Staude and the Town of
      North Andover (Docket No. 212) is **ALLOWED**, in part, and
      **DENIED**, in part, as follows:

      a)    with respect to John Carney, Richard Stanley and
            the Town of North Andover, **ALLOWED**;

      b)    with respect to Robert Barter as to Counts IV, V
            and VIII-XII, **ALLOWED**, but as to Counts I, VI and
            VII, **DENIED**;

      c)    with respect to Robert Hillner and Jay Staude as
            to Counts IV-XII, **ALLOWED**, but as to Count I,
            **DENIED**;

      d)    with respect to Charles Gray as to Counts II and
            IV-XII, **ALLOWED**, but as to Count I, **DENIED**;

3)    motion for summary judgment filed by Patrick Candeliere
      (Docket No. 215) is **DENIED** as moot[6];

4)    motions for summary judgment filed by defendants Edward
      Downer (Docket No. 218) and Debra Simon (Docket No.
      224) are, with respect to Counts IV-XII, **ALLOWED**, but
      are, with respect to Counts I and II, **DENIED**;

5)    motions for summary judgment filed separately by
      defendants Bryan Erickson (Docket No. 222), Scott
      Mackenzie (Docket No. 223), Michael Currier (Docket No.
      232), Sean McGarry (Docket No. 235), Michael Miskell
      (Docket No. 236) and jointly by defendants Richard
      Desforge and Bret Graham (Docket No. 229) are, with
      respect to Counts IV, V and VIII-XII, **ALLOWED**, but are,
      with respect to Counts I, VI and VII, **DENIED**; and

6)    motions for summary judgment filed by defendants
      Daniel Ciardiello (Docket No. 226) and Jodi Gerardi
      (Docket No. 234) are, with respect to Counts IV-XII,
      **ALLOWED**, but are, with respect to Count I, **DENIED**.

---

      [6] Mr. Candeliere was voluntarily dismissed from this case by
the plaintiffs on October 25, 2011, shortly after filing his
motion for summary judgment.

Accordingly, the following counts against the named defendants remain to be tried:

- Count I (direct liability for § 1983 violation), against Lieutenants Simon and Downer, Sergeant Gray, Detective Barter, Officers Desforge, Graham, Staude and Hillner and Troopers Ciardiello, Currier, Erickson, Mackenzie, McGarry, Miskell and Gerardi.

- Count II (supervisory liability for § 1983 violation), against Lieutenants Simon and Downer.

- Counts VI and VII (assault and battery) and Counts IX-XII (loss of consortium), against Detective Barter, Officers Graham and Desforge and Troopers Currier, Erickson, Miskell, Mackenzie and McGarry.

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated April 11, 2012